14-3686-bk
<u>In re: Lehman Brothers Inc.</u>

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: August 26, 2015     Decided: December 14, 2015)

Docket No. 14-3686

- - - - - - - - - - - - - - - - - - -x

IN RE: LEHMAN BROTHERS INC.

- - - - - - - - - - - - - - - - - - -x

ANZ SECURITIES, INC.; BMO CAPITAL MARKETS
CORP., f/k/a HARRIS NESBITT CORP.; BNY MELLON
CAPITAL MARKETS, LLC; CABRERA CAPITAL
MARKETS, LLC; BNP PARIBAS FS, LLC, as successor in
interest to FORTIS SECURITIES, LLC, f/k/a FORTIS
INVESTMENT SERVICES, LLC; NATIONAL
AUSTRALIA BANK, LTD.; SUNTRUST ROBINSON
HUMPHREY, INC.; THE WILLIAMS CAPITAL GROUP,
L.P.; DNB MARKETS, INC., f/k/a DNB NOR MARKETS,
INC.; NABSECURITIES, LLC,

<u>Appellants</u>,

- v.-

JAMES W. GIDDENS, as Trustee for the SIPA
Liquidation of Lehman Brothers Inc.,

Trustee-Appellee.

- - - - - - - - - - - - - - - - - - -x

Before:      WALKER, JACOBS, and LIVINGSTON, <u>Circuit Judges</u>.

This appeal concerns the proper application of Section 510(b) of the Bankruptcy Code to claims seeking contribution or reimbursement for losses incurred in the course of defending and settling securities fraud lawsuits brought by investors in securities issued by a debtor's affiliate.  Appellants challenge a judgment of the United States District Court for the Southern District of New York (Scheindlin, <u>J.</u>) affirming a bankruptcy court order (Peck, <u>J.</u>) subordinating Appellants' contribution claims pursuant to § 510(b) to the claims of the Debtor's general unsecured creditors.  For the following reasons, we **AFFIRM** the judgment and adopt the district court's construction of § 510(b).

> LUKE A. BAREFOOT, Cleary Gottlieb Steen & Hamilton LLP, New York, New York (Mitchell A. Lowenthal, Peter Fox, <u>on the brief</u>), <u>for Appellants</u>.
>
> JAMES C. FITZPATRICK, Hughes Hubbard & Reed LLP, New York, New York (James B. Kobak, Jr., Robert B. Funkhouser, Jordan E. Pace, Jason E. Zakai, <u>on the brief</u>), <u>for Trustee-Appellee</u>.

DENNIS JACOBS, <u>Circuit Judge</u>:

In order to ensure that claims which are in essence claims corresponding to ownership of securities (debt or equity) are confined to their proper tier of the waterfall, Section 510(b) of the Bankruptcy Code provides generally that "a claim arising from rescission of a purchase or sale of a security of the debtor or . . . for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security . . . ."  11 U.S.C. § 510(b).  The provision treats the security of an "affiliate" as a security of the debtor for this purpose. The provision was amended in 1984 to encompass claims for contribution for such damages.

This appeal concerns the proper application of that provision in the Lehman bankruptcies.  The Debtor here,  Lehman Brothers Inc. ("LBI"), was lead underwriter for unsecured notes issued by Lehman Brothers Holdings Inc. ("Lehman Holdings"), its affiliate and parent.  Following the bankruptcy of both the Lehman entity that issued the notes (Lehman Holdings) and the Lehman entity that was lead underwriter on the issuances (LBI), the "Junior

Underwriters"[1] were held to account for the noteholders' losses, and incurred

loss for defense and settlements. They now assert claims for contribution or

reimbursement against the liquidation estate of Debtor LBI as lead underwriter of

those notes.

The Bankruptcy Court of the Southern District of New York (Peck, J.)

construed the statute to require subordination of the Junior Underwriters'

contribution claims. The district court (Scheindlin, J.) affirmed the bankruptcy

court's order, adopting a different analysis. We adopt the district court's

construction of § 510(b), reject the various challenges to that construction, and

affirm the judgment.


## BACKGROUND

On September 15, 2008, Lehman Holdings filed for Chapter 11 bankruptcy

protection--the largest bankruptcy filing in U.S. history. Four days later, Lehman

---

[1] Appellants Junior Underwriters are ANZ Securities, Inc.; BMO Capital Markets Corp., f/k/a Harris Nesbitt Corp.; BNY Mellon Capital Markets, LLC; Cabrera Capital Markets, LLC; BNP Paribas FS, LLC, as successor in interest to Fortis Securities, LLC, f/k/a Fortis Investment Services, LLC; National Australia Bank, Ltd.; SunTrust Robinson Humphrey, Inc.; The Williams Capital Group, L.P.; DNB Markets, Inc., f/k/a DnB Nor Markets, Inc.; and nabSecurities, LLC.

Holdings's broker-dealer and wholly-owned subsidiary, LBI, was placed into

liquidation pursuant to the Securities Investor Protection Act of 1970, as amended

("SIPA"), 15 U.S.C. §§ 78aaa, et seq.[2]  James W. Giddens was appointed as SIPA

Trustee.  An automatic stay applied to both proceedings.  See 11 U.S.C.

§ 362.

Between 2004 and 2008, before the Lehman collapse, LBI (as lead

underwriter) and the Junior Underwriters launched 22 offerings of Lehman

Holdings securities, totaling $32.4 billion.  Beginning in December 2005, a Master

Agreement Among Underwriters (the "Agreement") governed the relationship

between LBI and the Junior Underwriters.  One provision of the Agreement

---

[2] SIPA was enacted following the failure of broker-dealers in 1969 and 1970.  In re Adler Coleman Clearing Corp., 195 B.R. 266, 269 (Bankr. S.D.N.Y. 1996).  It "protect[s] investors against financial losses arising from the insolvency of their brokers" and "protect[s] capital markets by instilling confidence in securities traders."  In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 239 (2d Cir. 2011) (first quoting In re New Times Sec. Servs., Inc., 463 F.3d 125, 127 (2d Cir. 2006); and then quoting SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314, 1317 (2d Cir. 1976)).  It "establishes procedures for liquidating failed broker-dealers and provides their customers with special protections. . . . [A] fund of 'customer property,' separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers."  Id. at 233 (quoting 15 U.S.C. § 78lll(4)).  "Notwithstanding the special protection afforded customers under SIPA, a SIPA liquidation is essentially a bankruptcy liquidation . . . ."  In re Adler Coleman Clearing Corp., 195 B.R. at 269; see 15 U.S.C. § 78fff(b).

created a right of contribution among co-underwriters (based on percentage participation) for losses or liabilities resulting from securities fraud claims arising out of the offerings.

After commencement of LBI's SIPA proceeding (and of its parent's Chapter 11 proceeding), investors in Lehman Holdings notes filed securities fraud lawsuits against the Junior Underwriters, alleging material misstatements and omissions in the offering documents. LBI was not a defendant due to the automatic stay. The Junior Underwriters allege that they collectively incurred almost $78 million in the defense and settlement of those claims.

The Junior Underwriters filed general creditor proofs of claim against LBI in its SIPA proceeding, asserting rights to contribution for their losses pursuant to the Agreement and Section 11(f) of the Securities Act of 1933, 15 U.S.C. § 77k(f). The SIPA Trustee objected on the ground, inter alia, that the claims were subject to mandatory subordination pursuant to 11 U.S.C. § 510(b).

The Junior Underwriters argued that § 510(b) could not be used to subordinate the claims in LBI's SIPA proceeding because the securities were issued by LBI's *parent*, rather than LBI. The Junior Underwriters acknowledge (as they must) that the section expressly applies to securities issued by "affiliate[s],"

6

and that it requires that such claims "be subordinated to all claims or interests

that are senior to or equal the claim[s] or interest[s] represented by such

securit[ies] . . . ."  But they argued (and argue) that: "a 'claim or interest

represented by such security' means . . .  an assertion of the rights to payment

concomitant to ownership of a given security," Br. of Appellants at 26-27; claims

arising from the purchase or sale of securities of a debtor's affiliate (and claims

for contribution on account of such a claim) therefore can be subordinated in the

debtor's bankruptcy or SIPA proceeding only when claims also could be made in

that proceeding based on ownership of the affiliate's securities; and, since the LBI

estate did not independently contain securities issued by its parent, there were no

"claim[s] or interest[s] represented by" the Lehman Holdings-issued securities to

which the Junior Underwriters' contribution claims could be subordinated.  See

id. at 5-6, 13, 26, 35-38.  In other words, they argued that because the Lehman

Holdings-issued securities were not otherwise part of LBI's waterfall,

§ 510(b) did not apply to the Junior Underwriters' claims.

Bankruptcy Judge Peck rejected the Junior Underwriters' arguments and

ordered their claims subordinated to the claims of general unsecured creditors.

In re Lehman Bros. Inc., 503 B.R. 778 (Bankr. S.D.N.Y. 2014).  The bankruptcy

7

judge reasoned that, when considering affiliate securities, the "claim[s] . . . represented by" the parent securities were the claims for contribution themselves: general unsecured claims, connected in subject matter to the underlying securities.  Id. at 784-85, 787.

District Judge Scheindlin affirmed the bankruptcy court's order, but on another ground.  To determine the level of subordination, the district judge focused on the type of security rather than on the type of claim.  See In re Lehman Bros. Inc., 519 B.R. 434, 450 & n.94, 451 & n.99 (S.D.N.Y. 2014).  Her opinion reasoned that "any ambiguity in the statute lies not in *whether* claims based on securities of an affiliate are to be subordinated but *how* that subordination is to occur," and that, in this instance, "[a] straightforward and practical application of section 510(b) recognizes that unsecured, non-equity securities"--like the notes at issue--"represent unsecured claims, meaning that claims involving such securities must be subordinated to general unsecured claims."  Id. at 449-51; see also id. at 452 ("In cases involving affiliate securities, the type of security dictates the level of subordination whether or not that security represents an actual claim in the debtor's case.").  This appeal followed.[3]

_____

[3] The decisions below also subordinated claims by two entities that are not parties to this appeal, Claren Road Credit Master Fund Ltd. and UBS Financial

## DISCUSSION

"We exercise plenary review over a district court's affirmance of a bankruptcy court's decision," reviewing <u>de novo</u> the bankruptcy court's conclusions of law, and reviewing its findings of fact for clear error.  <u>In re AppliedTheory Corp.</u>, 493 F.3d 82, 85 (2d Cir. 2007) (per curiam).  The facts material to the appeal are undisputed, so our review is <u>de novo</u>.  For the following reasons, we adopt the district court's construction of § 510(b), and affirm the judgment subordinating the Junior Underwriters' claims.

## I

Section 510(b) of the Bankruptcy Code, which applies to this SIPA proceeding (<u>see</u> 15 U.S.C. § 78fff(b)), provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor *or of an affiliate of the debtor*, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to *all claims or interests that are senior to or equal the claim or interest represented by such security*, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphases added).

————————————

Services, Inc.

9

The Code thus requires that the Junior Underwriters' claims for contribution be subordinated--so long as there is a reasonable reading of § 510(b) that locates their claims on a proper tier of the Debtor's waterfall. The Junior Underwriters contend that no such reading is possible. We disagree.

We adopt the district court's analysis. We hold that in the affiliate securities context, "the claim or interest represented by such security" means a claim or interest of the same type as the affiliate security. Claims arising from securities of a debtor's affiliate should be subordinated in the debtor's bankruptcy proceeding to all claims or interests senior or equal to claims in the bankruptcy proceeding that are of the same type as the underlying securities (generally, secured debt, unsecured debt, common stock, etc.; and in some circumstances potentially a narrower sub-category).

## II

Textual principles lead us to this result. See Bustamante v. Napolitano, 582 F.3d 403, 406 (2d Cir. 2009) ("Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." (alteration omitted) (quoting Puello v. BCIS, 511 F.3d 324, 327 (2d Cir. 2007))).

The phrase "represented by" is not self-reading and is largely unhelpful. At the same time, our construction is consistent with an ordinary meaning of the word "represent". See Mary Jo. C. v. N.Y.S. & Local Ret. Sys., 707 F.3d 144, 155 (2d Cir. 2013) ("[W]e 'review the statutory text, considering the ordinary or natural meaning of the words chosen by Congress . . . .'" (quoting United States v. Aguilar, 585 F.3d 652, 657 (2d Cir. 2009))); 4 Collier on Bankruptcy 510.04[1] (16th ed. 2009) ("If the security is an unsecured debt instrument, the claim that is represented by that security is a general, unsecured claim.");[4] Webster's Third New International Dictionary of the English Language Unabridged 1926 (1986) (defining "represent" as, inter alia, "to correspond to in kind").

Moreover, our reading gives meaning to the entire provision, allowing the statute to operate on claims relating to affiliate securities--which are expressly included. See Samantar v. Yousuf, 560 U.S. 305, 319 (2010) ("We do not construe statutory phrases in isolation; we read statutes as a whole." (alterations omitted) (quoting United States v. Morton, 467 U.S. 822, 828 (1984))); Tablie v. Gonzales, 471 F.3d 60, 64 (2d Cir. 2006) ("We are obliged 'to give effect, if possible, to every

---

[4] Collier was not referencing claims arising out of affiliate securities, and the observation would be non-controversial in the non-affiliate context.

clause and word of a statute,' and to render none superfluous." (alteration

omitted) (quoting <u>Collazos v. United States</u>, 368 F.3d 190, 199 (2d Cir. 2004))).

The Junior Underwriters have proposed no convincing rationale for their

alternative construction, under which the affiliate securities provision would

operate only in two (hypothetical) instances: when a debtor's and its affiliate's

estates are substantively consolidated in bankruptcy, and when the debtor had

guaranteed payment on the securities of its affiliate.  As a preliminary matter,

nothing in the text of § 510(b) suggests the affiliate provision is so limited, and in

the absence of any textual hook we hesitate to adopt a narrow construction of a

section that our precedent suggests should be read "broadly."  <u>In re Med</u>

<u>Diversified, Inc.</u>, 461 F.3d 251, 259 (2d Cir. 2006).  Additionally, as the district

court explained in rejecting the significance of the first hypothetical, it is

"unlikely that Congress . . . relied on [substantive consolidation] to provide

meaning to the 'affiliate' language," given that such consolidation is not provided

for explicitly in the Bankruptcy Code.  <u>In re Lehman Bros. Inc.</u>, 519 B.R. at 451-52

(citing <u>In re Augie/Restivo Baking Co.</u>, 860 F.2d 515, 518 (2d Cir. 1988)).

The Junior Underwriters' textual argument is flawed on its own terms.

They contend that the district court "effectively amend[ed]" the statute.  Reply

Br. at 13; see also Br. of Appellants at 19. But the Junior Underwriters'

construction is no more a plain language reading than the one the district court

expressed and we adopt. They would read the phrase "claim or interest

represented by such security" to mean a claim or interest *based on ownership of*

such security in this proceeding. Such language does not appear in § 510(b).[5]

### III

The available legislative history supports a construction that reaches

affiliate securities in the ordinary case. Section 510(b) emerged from two distinct

bills, neither of which included claims arising out of transactions in affiliate

---

[5] Various constructions have been advanced to give effect to the "affiliate" language. Our construction is preferable to the competing constructions advanced in this litigation. The bankruptcy court's approach is less plausible as a textual matter: Section 510(b) directs subordination to "claims or interests that are senior to or equal the claim or interest represented by such *security*," not to the claim or interest represented by such *claim*. The Trustee's alternative approach--to which he devotes a single paragraph of his appellate brief--asks the bankruptcy court to assume that LBI was liable on its parent's securities and to subordinate the contribution claims below those phantom liabilities (disregarding their separate corporate forms). Furthermore, the Trustee appears to imagine that such phantom claims (based on ownership of the parent's securities) would be situated at the very bottom of LBI's waterfall--below even the claims based on ownership of LBI common stock. Such a super-subordination seems inconsistent with the directive that no claims are to be subordinated below the level of the debtor's common stock. See 11 U.S.C. § 510(b).

13

securities; they subordinated only claims arising from the purchase or sale of securities issued by the debtor.[6]  In the drafting process, Congress expressly included claims based on affiliate securities.  See 11 U.S.C. § 510(b) (1982); Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, § 510(b), 92 Stat. 2549, 2586 (1978).  Congress further expanded § 510(b)'s reach in 1984, with the addition of claims for reimbursement and contribution.  See Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, tit. III, sec. 451, 98 Stat. 333, 375 (1984); In re Mid-Am. Waste Sys. Inc., 228 B.R. 816, 824 (Bankr. D. Del. 1999) (describing 1984 amendment).

Congressional reports disclose no substantive discussion of either change.  See In re Lehman Bros. Inc., 519 B.R. at 442 n.47 ("[T]he legislative history of section 510(b) does not discuss the inclusion of affiliates in the statute."); In re Mid-Am. Waste Sys. Inc., 228 B.R. at 824 ("Congress's 1984 amendment to § 510(b) was not accompanied by any legislative history.").  But they were both broadening measures.  And § 510(b) case law--our own and that of other courts--

---

[6] As relevant here, both proposed bills subordinated "any claim for rescission of the purchase of securities issued by the debtor corporation or for damages resulting from the purchase or sale of such securities."  See Bankruptcy Act Revision, Hearings on H.R. 31 and H.R. 32 Before the Subcommittee on Civil & Constitutional Rights of the H. Comm. on the Judiciary, 94th Cong. 27, App'x 1 at 1, 142, App'x 2 at 355 (1976) (proposed 1975 bankruptcy acts).

endorses a "broad" interpretation of the section (at least to the extent that such an interpretation is plausibly supported by the text).  See, e.g., In re Med Diversified, Inc., 461 F.3d at 255, 259; In re Telegroup, Inc., 281 F.3d 133, 135-36 (3d Cir. 2002); In re Betacom of Phoenix, Inc., 240 F.3d 823, 827, 830-31 (9th Cir. 2001); In re Enron Corp., 341 B.R. 141, 151, 153-54, 158-59, 163 (Bankr. S.D.N.Y. 2006).[7]

## IV

Just as the available legislative history supports our construction, so too does analysis of the rationales that motivated Congress to enact the section in the first place. The original enactment of § 510(b) was motivated by an influential law review article by Professors John J. Slain and Homer Kripke.  In re Med Diversified, Inc., 461 F.3d at 255; see Slain & Kripke, The Interface Between Securities Regulation and Bankruptcy--Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors, 48 N.Y.U. L. Rev. 261 (1973).  Slain and Kripke called for reinforcement of the absolute priority rule, by which creditors recover in full before equity holders recover any of their

---

[7] These cases concerned the types of claims eligible for subordination by virtue of falling within the first half of § 510(b) (referred to as "arising-from" claims).

investment.  Slain & Kripke, supra, at 261.  They proposed mandatory

subordination in a debtor's bankruptcy proceeding of claims alleging fraud and

similar violations in the issuance of the debtor's securities, "because the

bankruptcy courts' favorable treatment of shareholder fraud claims provided

'investors a windfall by giving them an opportunity to reap the benefits of a

profitable entity and by allowing them to share with creditors in the event the

enterprise was forced to reorganize or liquidate.'"  In re Med Diversified, Inc.,

461 F.3d at 256 (quoting In re PT-1 Commc'ns, Inc., 304 B.R. 601, 609 (Bankr.

E.D.N.Y. 2004)).

Slain and Kripke's article gave two related policy rationales for

subordination: "(1) the dissimilar risk and return expectation of shareholders and

creditors," referred to as the "risk-allocation rationale"; and "(2) the reliance of

creditors on the equity cushion provided by shareholder investment," referred to

as the "equity cushion rationale." Id. at 256, 259; see Slain & Kripke, supra, at 286-

91.  Congress generally adopted the Slain and Kripke rationales when enacting

§ 510(b), which incorporated much (though not all) of the proposal advanced in

their article.  See In re Med Diversified, Inc., 461 F.3d at 255-56; In re Telegroup,

Inc., 281 F.3d at 139; H. Rep. No. 95-595, at 194 (1977) ("The argument for

16

mandatory subordination is best described by Professors Slain and Kripke."); id.

at 194-96 (summarizing and adopting their argument).[8]

The risk-allocation rationale is "'more integral to any policy analysis of

section 510(b)'" than is "the equity cushion concept," the latter being "'only one

part of the broader judgment concerning risk allocation.'"  In re Med Diversified,

Inc., 461 F.3d at 258-59 (quoting In re Enron Corp., 341 B.R. at 166); see also In re

Telegroup, Inc., 281 F.3d at 139 (noting that Slain and Kripke "conceptualiz[ed]

the issue as one of risk allocation"); Slain & Kripke, supra, at 263; id. at 267 ("We

are only incidentally concerned with the precise predicate of a disaffected

stockholder's efforts to recapture his investment from the corporation.").  Risk

allocation serves as an effective rationalization for subordination in those

circumstances when an affiliate's securities provide the basis for the claim,

because the purchasers of the securities issued by the affiliate have taken on the

risk-return expectations of investors while the debtor's creditors have not.[9]  See

---

[8]  Slain and Kripke did not propose subordinating claims arising from the
purchase or sale of securities of the debtor's *affiliate*, and therefore had no
occasion to consider how or whether the rationales they offered might bear upon
the subordination of such securities.  See generally Slain & Kripke, supra.

[9] Several courts have concluded that the reimbursement and contribution
amendment was a "logical extension" of the original risk-allocation rationale,
and that Congress intended to ensure that the "risks associated with the

<u>In re Med Diversified, Inc.</u>, 461 F.3d at 258-59.  Moreover, we need not determine

whether this rationale is strong enough to warrant subordination of claims

arising out of transactions in affiliate securities--Congress has already

determined that it is.  <u>See</u> 11 U.S.C. § 510(b).

---

issuance of stock [and securities]" were placed on the "underwriter, who is in a
better position to evaluate such risks," and were not shifted to general unsecured
creditors.  <u>In re Mid-Am. Waste Sys., Inc.</u>, 228 B.R. at 825-26, 828; <u>see also, e.g.</u>, <u>In
re Jacom Comput. Servs., Inc.</u>, 280 B.R. 570, 572 (Bankr. S.D.N.Y. 2002); <u>In re
Walnut Equip. Leasing Co.</u>, No. 97-19699 (DWS), 1999 WL 1271762, at *9-10
(Bankr. E.D. Pa. Dec. 28, 1999).

In the bankruptcy court, the Junior Underwriters acknowledged that a
"debtor's underwriters are better positioned to manage [the risk of the debtor's
failure] than its creditors."  J.A. 182 ¶ 34 (Resp. Of Underwriter Claimants to the
Trustee's One Hundred Fourth Omnibus Objection to General Creditor Claims).
They now argue, however, that the rationale of these cases is "dubious," and that
"in any event, it only holds for the *issuer's* creditors since it focuses solely on
which parties--the issuer's underwriters or the issuer's creditors--were better
positioned to protect themselves from the *issuer's* wrongful conduct."  Br. of
Appellants at 32-33.  If a policy judgment on this point were required to resolve
this case, we might find that, as between the Junior Underwriters and LBI's
general creditors--which had no involvement in the issuance of securities of LBI's
parent--the Junior Underwriters were likely better situated to anticipate and
manage the risk of material misstatements or omissions in the Lehman Holdings
offering materials.  <u>See</u> <u>Chris-Craft Indus. Inc. v. Piper Aircraft Corp.</u>, 480 F.2d
341, 370 (2d Cir. 1973) (noting underwriters' "expertise in appraising the
securities issue and the issuer" and their "special motive thoroughly to
investigate the issuer's strengths and weaknesses").  But we need not make such
a finding; Congress explicitly included claims for contribution on account of
damages claims arising from the securities of a debtor's affiliate in § 510(b).

"Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding." In re Enron Corp., 341 B.R. at 158. In order to prevent such bootstrapping from being effected indirectly, the statute likewise subordinates claims for contribution and reimbursement based on payments made to disappointed investors.

## V

Every other court that has applied § 510(b) to claims based on affiliate securities--when the debtor was a corporate entity--has required subordination.[10] However, a survey of these cases provides little guidance in determining the appropriate level of subordination. They come out diverse ways; many do not discuss the issue explicitly; some that do give no reasons; and none involves a claimant making the same type of textual argument that the Junior Underwriters

---

[10] See, e.g., In re Am. Hous. Found., 785 F.3d 143 (5th Cir. 2015); In re VF Brands, Inc., 275 B.R. 725 (Bankr. D. Del. 2002); In re Lernout & Hauspie Speech Prods., N.V., 264 B.R. 336 (Bankr. D. Del. 2001); In re Basin Res. Corp., 190 B.R. 824 (Bankr. N.D. Tex. 1996); In re Wis. Barge Line, 76 B.R. 142 (Bankr. E.D. Mo. 1987); see also In re Del Biaggio, No. 12-CV-6447 (YGR), 2013 WL 6073367 (N.D. Cal. Nov. 18, 2013) (same result in individual debtor case).

present here.  But they nevertheless provide ballast for an interpretation of the

statutory text that reaches affiliate claims in the ordinary case.[11]


# VI

When a bankruptcy court subordinates claims arising out of securities that

were issued by the debtor's affiliate,  it may become somewhat messy to

superimpose the capital structure of the affiliate onto that of the debtor (although

this case may not require the bankruptcy court to confront these issues[12]).

Nevertheless, our approach works in broad strokes, and preserves flexibility

needed by the bankruptcy court.

---

[11] The one case on which the Junior Underwriters rely, In re Khan, 523 B.R. 175 (9th Cir. B.A.P. 2014) (declining to apply the statute to claims relating to affiliate securities in the bankruptcy proceeding of two individual debtors), is easily distinguishable.  The rationale of the court (which did not parse the meaning of "represented by") was focused entirely on whether the statute applies to an individual (non-corporate) debtor.  See id. at 182-83.  It found the text to be ambiguous on this question, and ultimately determined that § 510(b) does not apply to an individual debtor, because the policy rationales behind it are inapt: An individual debtor's creditors do not rely on any equity cushion when determining whether to extend credit, and the two different levels of risk-return expectations do not exist.  Id. at 183.

[12] LBI's SIPA liquidation has a single class of general unsecured creditor claims; and it appears that these claims are expected to consume the LBI estate. See Br. for Appellee at 30-31; cf. Reply Br. at 10.

The bankruptcy court will be guided by the instruction that claims arising from securities of a debtor's affiliate are to be subordinated to all claims or interests senior or equal to claims in the bankruptcy proceeding that are of the same type as the underlying securities (generally, secured debt, unsecured debt, common stock, etc.). The bankruptcy court is well-suited to engage in that kind of classification and discrimination. A court of equity may also determine whether it makes sense to group claims for subordination into narrower sub-categories. When granular distinctions of priority among the affiliate's securities are not mirrored in the debtor's estate, a bankruptcy court may have to add tiers to the waterfall or, in a different case, may have to group multiple levels of priority. Similar choices are made in Chapter 11 reorganizations, in which bankruptcy judges determine whether securities are "substantially similar" to other securities such that they should be classified together. See 11 U.S.C. § 1122 (providing that a debtor's reorganization plan "may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class").

Bankruptcy judges regularly make these types of determinations, and they are better situated to do so than we are.

21

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.